555 A.2d 772

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Carol STONEHOUSE, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 30, 1988.

Decided March 3, 1989.

42

Lester G. Nauhaus, Public Defender, John H. Corbett, Jr., Chief—Appellate Div., Shelley Stark, Appellate Counsel, Office of the Public Defender, Pittsburgh, for appellant.

David Rudovsky, Philadelphia, amicus curiae, for Pennsylvania Coalition Against Domestic Violence, etc.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Deputy Dist. Atty., Dara A. DeCourcy, Asst. Dist. Atty., Pittsburgh, Pa., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION ANNOUNCING THE JUDGMENT
## OF THE COURT

LARSEN, Justice.*

The issues of concern presented by this appeal involve the ineffectiveness of trial counsel in a homicide case in 1) failing to request jury instructions that would require the jury to consider the cumulative effects of psychological and physical abuse when assessing the reasonableness of a battered person's fear of imminent danger of death or serious bodily harm with respect to a claim of self-defense and when assessing what constitutes sufficient provocation to support a conviction for voluntary manslaughter; and 2) failing to present expert testimony on the battered woman syndrome with regard to the characteristics of victims of psychological and physical abuse, where uncontradicted testimony reveals that the defendant was a victim of such abuse, and a jury, without the aid of expert testimony, is likely to render a verdict based upon erroneous myths concerning the victims of such abuse.

As to the second issue of ineffectiveness raised, counsel for appellant, Carol Stonehouse, stated at oral argument that the battered woman syndrome is not implicated in the case. Although appellant's counsel did not address the second issue in terms of the battered woman syndrome, this issue was addressed by amici, various organizations that provide services to the victims of domestic violence, in the brief which they submitted to this Court. Accordingly, we shall address this issue infra.

On the morning of March 17, 1983, appellant shot and killed William Welsh. The events culminating in Welsh's death are so bizarre that one would be tempted to dismiss them as the stuff of pulp fiction were it not for the corroboration of disinterested witnesses and for the fact that the literature on the "battered woman syndrome" is

* This case was reassigned to this writer on January 18, 1989.

replete with similar cases.[1]

The chronology of events leading to Welsh's death are as follows. In March of 1980, less than a month after appellant completed her training as a police cadet and assumed her duties as a police officer in the City of Pittsburgh, appellant met Welsh. Welsh was married at that time and had served as a Pittsburgh police officer for approximately twenty years. Appellant had been twice divorced. The two began dating shortly after they met. Welsh often left his "beat" to visit appellant, and he assured her that other police officers would cover for him. Notes of Testimony at 803 (Aug. 30—Sept. 14, 1983) (hereinafter referred to as N.T.). Within the first three months of their relationship, Welsh broke into appellant's apartment once, N.T. at 803, and, shortly thereafter, made such a nuisance of himself by banging on her door late at night, that she called the police. N.T. at 804–08. That incident was treated as a "domestic" by the officers, who knew Welsh, and no police report was filed. N.T. at 1683–40. Appellant attributed Welsh's behavior to a drinking problem and continued dating him.

Welsh was possessive and demanding with respect to his relationship with appellant. By the fall of 1980, whenever appellant did not do what he told her to do, Welsh would let the air out of the tires of her car. N.T. at 813. This occurred as often as two or three times a week. Welsh admitted doing this, but insisted that appellant would never be able to prove he was doing it. N.T. at 814. Arguments began to occur with some frequency, and, after one such argument, Welsh was able to enter appellant's secured apartment building and place flowers outside her door. N.T. at 811–13. Welsh told appellant the flowers were for her funeral. N.T. at 813. Welsh also put sugar in the gas tank of appellant's car, N.T. at 817, and on many occasions

---

1. We refer to the syndrome as the battered *woman* syndrome inasmuch as it has been described in the literature on the subject in this manner. *See, e.g.,* Walker, *The Battered Woman* (1979). We recognize, however, that there are instances where the victims of physical, sexual and psychological abuse may be men. We shall apply the rules pertaining to the syndrome to men as well as to women.

he would take appellant's car and move it, N.T. at 817, or he would pull the ignition wires. N.T. at 819, 1630. It was also in the fall of 1980, that Welsh began to harass appellant by telephoning her late at night. N.T. at 815.

Welsh justified his acts of vandalism and harassment by stating to appellant that she "deserved it." N.T. at 816. Welsh threw a brick through the back door of appellant's apartment when she was having a beer with a friend who had given her a ride on one of those occasions when her car was not running. N.T. at 820, 1631. Welsh told appellant she could not prove who had broken the window, so she did not file a police report, yet he fixed the window for her. *Id.* Despite the fact that appellant changed the locks on her apartment doors, Welsh was always able to get in and would take things, particularly personal phone books and papers with phone numbers on them. N.T. at 821.

Before the end of 1980, appellant no longer wanted to see Welsh, but if she refused to date him, he would "punish" her by letting the air out of her car tires. N.T. at 822. Welsh continued to enter her apartment when appellant was away and, in October of 1980, he broke in once when appellant was in her apartment. N.T. at 824. Appellant tried to eject him by brandishing a blackjack, and when Welsh hastily retreated, he broke his ankle. N.T. at 826. In spite of the fact that his injury did not occur on the job, Welsh bragged to appellant that his friends in the police department were able to secure workmen's compensation benefits for him. N.T. at 826.

Appellant told Welsh she did not want to be "tied up with a married man," N.T. at 828, and she dated another police officer briefly. Several times, that officer's car tires were flattened. N.T. at 828, 1589. In October of 1980, while Welsh was still on crutches, he responded to appellant's conversation in a bar with another man by wrecking appellant's apartment. N.T. at 830–39. Welsh threw food on the floors and walls, cut up appellant's clothes, tore the curtains from the windows, urinated on and sliced the bed, ripped the wires out of the television, and soaked appel-

lant's shoes and clothes in hot water. Appellant did not call the police immediately because she did not think she could prove that Welsh had damaged her apartment. N.T. at 832. Later that night, Welsh returned and appellant called the police. He tried to leave, but appellant wanted to make sure he would be there when the police arrived, so she attempted to subdue him with a blackjack, and she took his crutches from him. N.T. at 834–35. The police knew Welsh, so they did not make a report. They insisted that appellant serve as the arresting officer. N.T. at 836. Appellant wrote her own report and also approached Internal Affairs with the problem, with no result. N.T. at 837. Appellant filed a complaint with a magistrate regarding this incident. Upon appellant's return from the magistrate's office, she encountered Welsh coming out of her apartment, and he threatened to kill her. N.T. at 837. The magistrate knew Welsh, so Welsh was only required to stay away from appellant for thirty days, after helping her clean the apartment, and replacing her clothes and drapes and the money he had taken. N.T. at 839.

Following the brief hiatus in the "relationship" which occurred after appellant went to the magistrate, Welsh began calling appellant at least twenty times a day. N.T. at 843. Appellant felt sorry for Welsh, so she agreed to meet with him to make it clear that she did not want to see him any more. N.T. at 844–45. When appellant asked Welsh to take her home from this meeting, Welsh drove instead to a shopping center where he dragged her out of the car and then repeatedly attempted to run over her with the car. N.T. at 845–46. Failing to run over appellant, Welsh finally jumped out of the car and punched appellant, breaking her nose and rendering her semi-conscious. Appellant recalled seeing flashing red lights at the scene, but no arrest was made of Welsh at that time. N.T. at 1177–79. Welsh took appellant to the hospital for treatment. N.T. at 846.

In the summer of 1981, appellant's landlord did not renew appellant's lease because of Welsh and the arguments that were disturbing the other tenants. N.T. at 853. When

appellant prepared to move from her apartment, Welsh came in, broke a box of dishes, and left without saying a word. N.T. at 849. Appellant had not had much time to find an apartment, so she moved to an available unit that was one block outside the City of Pittsburgh. *Id.* Following the move, Welsh spent many hours in appellant's apartment when she was not there, and if he was not in the apartment, he would be parked outside the building. N.T. at 852. Appellant did not intend to remain there long, knowing that residency in the city is required of police officers, but her daughter, who was separated from her husband at that time, moved into appellant's new apartment with her baby. N.T. at 854. Appellant did not call the police to complain about Welsh's behavior because she was living outside the city limits.

Welsh left notes everywhere for appellant—on her car, at work, at the spa, N.T. at 855—and he started to follow her everywhere she went. N.T. at 856. Welsh sent appellant a birthday card, which appellant tore up and threw in the bottom of a bag of garbage. Welsh broke into appellant's apartment, retrieved the card from the garbage, pieced it together and placed it on appellant's bed. N.T. at 856. Appellant saved the notes Welsh left for her and made notations regarding his acts of harassment. N.T. at 857. Welsh took the folder in which she stored the notes. *Id.* At trial, appellant introduced three notes into evidence, which notes Welsh had evidently overlooked. One was blank; one stated: "Have a nice day, asshole," N.T. at 858; and the third stated: "41–year–old bifocal bitch." N.T. at 859.

Welsh continued to break into appellant's apartment and on two occasions in the fall of 1981, appellant did call the police. The first time, Welsh entered appellant's room in the middle of the night. A physical scuffle ensued which threatened the safety of appellant's grandchild who was sleeping in the room. N.T. at 867. The same week, Welsh entered the apartment and dumped a bucket of ice water on appellant in the middle of the night. N.T. at 868. He left

and then returned with another bucket. Appellant's daughter called the police while appellant scuffled with Welsh. The police found the apartment door frame splintered from a forced entry and water spilled all over the stairs. N.T. at 1683. As the police were questioning appellant at the apartment, Welsh called to say he would break the windshield of appellant's car, and then he immediately did so. N.T. at 1686. Welsh was arrested and became combative. *Id.* Welsh kicked and struggled in the police truck and made lewd remarks. N.T. at 1687. He also threatened the arresting officer. N.T. at 1689. Appellant did not press charges against Welsh when she was reminded at the police station that she was not living within city limits. N.T. at 873. Welsh paid for the broken windshield. *Id.*

Welsh continued to harass appellant by filling her dresser drawers with water, soaking the clothes in her closet, and leaving beer bottles all over her apartment. N.T. at 873. One night, after appellant's daughter and grandchild moved out at the end of 1981, Welsh turned on the gas in appellant's apartment. Appellant became quite ill, but Welsh woke her in the morning with all the windows open, saying "I couldn't do it to you this time, you bitch. I'll do it the next time." N.T. at 862. He also took the keys to her car on this occasion and stole her car. N.T. at 861.

Welsh continued to follow appellant everywhere until she finally gave up going out socially during the first eight or nine months of 1982. N.T. at 874. Welsh always seemed to know where appellant was going, and, in fact, at one time he tapped her telephone. N.T. at 875. In January of 1982, Welsh entered appellant's apartment in the middle of the night and threatened to "slice up" appellant's face. N.T. at 877. When asked if she had done anything to provoke this attack, appellant replied, "No. I wasn't going out. I was trying not to provoke him. That's why I quit going out, because everything I did, I didn't do nothing right. Couldn't do nothing right." *Id.* The same night, Welsh put a gun to appellant's head and threatened to blow her brains out. *Id.* Appellant was so terrorized by Welsh that she

fled early one morning in January of 1982, to her sister's home, certain that Welsh was going to kill her. N.T. at 924, 1556. Welsh called appellant there day and night and showed up at the door. N.T. at 927, 1558–65. He cursed and threatened appellant's sister. N.T. at 1559. Appellant did not want to further inconvenience her sister's family, so when Welsh took appellant's car and moved it back to her apartment, she reluctantly returned after telling her sister about her life insurance policies and bank accounts. N.T. at 1566.

Welsh continued to follow appellant everywhere, N.T. at 878, and he continued to enter her apartment at night. At times, appellant would awaken and find Welsh crawling on her bedroom floor. N.T. at 880. Welsh continued to sabotage appellant's car, flattening tires, tampering with the windshield wiper mechanism, and taking the car and moving it. N.T. at 880–81. It was also in January of 1982, that Welsh followed appellant when she went to her son's high school basketball games. N.T. at 929, 1583–85. Welsh called appellant a "bitch" and a "slut" and told her he would embarrass her in front of her son. N.T. at 930, 1583. Appellant's ex-husband testified that the tension between Welsh and appellant was palpable at these times, and he interceded once on her behalf. N.T. at 1585.

In May of 1982, appellant moved to the Mt. Washington section of the City of Pittsburgh. She did so to be able to report Welsh's acts of harassment to the police. N.T. at 882. Appellant warned her landlord that it was possible there would be trouble from Welsh. N.T. at 883. Immediately after the move, Welsh began driving his private van vehicle continuously around the neighborhood. N.T. at 884. By June of 1982, Welsh returned to his more destructive behavior and kicked in the back door of appellant's apartment, accusing appellant of having affairs with other men. N.T. at 885. Welsh also kicked in the front door to appellant's apartment. This was done numerous times according to appellant's landlord. N.T. at 1451. Welsh's note writing, his phone calling, his damaging of appellant's vehicle,

and his banging and kicking on appellant's doors continued through the summer months. N.T. at 889.

Appellant's neighbors testified that they saw Welsh's van driving on the streets around the apartment every time they looked out their windows, and Welsh would wake them up regularly, pounding on appellant's doors and shouting obscenities at appellant. N.T. at 102–04, 139–41, 154, 1542–45. Residents at locations within view of appellant's apartment testified that Welsh would sit near their homes in his van often during the day and peer at appellant's apartment through binoculars. N.T. at 1573, 1578. The police were notified, but nothing was done as, one witness was told, it was just a "domestic matter." N.T. at 1575. Appellant's landlord also saw Welsh's van frequently in the neighborhood, N.T. at 1449, and found him one day in the basement of the building. N.T. at 1447. The landlord caught Welsh staring at appellant's apartment with binoculars, N.T. at 1450, and saw folded pieces of paper stuck in the door jambs to appellant's apartment at odd hours. N.T. at 1457.

In July, 1982, growing more bold, Welsh attempted to climb onto appellant's second floor front porch in "broad daylight." N.T. at 891, 1442–46. Appellant locked herself in the apartment and armed herself with a gun. Welsh left, and on his way off the porch, he fell and broke his leg again. N.T. at 893. While Welsh was still on crutches, appellant decided to help a friend by giving her a ride out of the city. Welsh, who would not permit her to leave the city, was caught attempting to immobilize appellant's vehicle. N.T. at 897. At about that time, Welsh stole appellant's car again, because she had danced with another man at a lounge. N.T. at 898. Appellant filed a report with the police, and later found her car in front of her apartment with one side scratched. N.T. at 899–900.

In August of 1982, appellant made plans with a woman friend to spend a few days in Erie, just so she could get a respite from Welsh's harassment. N.T. at 900. All their plans were made face-to-face to preclude the discovery of the plans by Welsh, and the drive to Erie was made without

spotting Welsh. N.T. at 901. After a day at the beach, the women left the motel to go to a lounge, and Welsh appeared on the highway as they pulled out of the motel parking lot. N.T. at 902, 1530. He followed them to the lounge. N.T. at 902, 1531. Welsh followed them to another lounge and then back to the motel where he sat in his vehicle and watched the room. N.T. at 903, 1534. Cutting short their vacation, the women returned to Pittsburgh the next day. N.T. at 904, 1535. There was no escape for appellant from this man, no safe refuge.

In September of 1982, appellant filed harassment charges against Welsh with a magistrate. N.T. at 905. At the hearing, witnesses testified about Welsh breaking appellant's doors and following her, and appearing uninvited at social events to which appellant had been invited. *Id.* Welsh admitted harassing appellant and admitted breaking her nose. N.T. at 906. Welsh was ordered to stay away from appellant for sixty days. At that time, appellant dated another man briefly. N.T. at 908, 1550. Welsh gave the man's estranged wife appellant's name, address and phone number and warned the man not to see appellant, saying "Remember, you got kids." N.T. at 1552. Welsh also followed appellant and that man on a date and threatened appellant's companion with a gun. N.T. at 1553. At the next hearing before the magistrate in November, 1982, the charges were dismissed because Welsh had not been harassing appellant. N.T. at 906.

Appellant almost immediately began receiving phone calls again from Welsh. N.T. at 907. During one of the calls, she was told that Welsh was the subject of a protection from abuse order obtained by his wife. N.T. at 908. He blamed this on appellant. N.T. at 909. At some time in December of 1982, Welsh left his job on disability. N.T. at 827. Welsh continued to appear wherever appellant went. N.T. at 912. On New Year's Eve, 1982, appellant went out with another woman friend. Welsh bought the two a bottle of champagne, N.T. at 912, and then threw two drinks in appellant's face, N.T. at 913–14, and threatened to kill her.

N.T. at 914. Appellant fled to her woman friend's residence, but Welsh forced his way into that residence and pulled appellant's hair and spit on her. N.T. at 916, 1487.[2] When appellant left, Welsh ran her car off the road, took her glasses, beat her head against the inside of her car and spit on her again, saying, "Wait till you get home. Wait till you get home." N.T. at 917.

When appellant returned to her residence she found that Welsh had again wrecked and defiled her apartment. N.T. at 918–21, 1429–37. There were seventeen knife slashes in appellant's waterbed. N.T. at 918, 1455. The water damaged the apartment on the first floor occupied by another tenant, and the water flowed into the basement of the building. *Id.* Drapes had been slashed or torn off the windows and stuffed into the toilet. N.T. at 919, 1430. Appellant's clothes were soaking in the bathtub with beet juice and hot water. N.T. at 918, 1431. Cleaning supplies, cold cream, lotion, food and potting soil were smeared all over the walls, windows, floors, mirrors and rugs. N.T. at 918–20, 1432–36. Curtain rods and racks were torn off the walls. N.T. at 1430, 1433, 1437. The back door was off its hinges, N.T. at 921, 1438, and every closet was emptied, every piece of furniture upset. N.T. at 1436, 1437. Appellant filed a police report, but did not pursue charges against Welsh with the magistrate because Welsh convinced her that his friends would say he had been elsewhere that night. N.T. at 921.

Welsh continued following appellant, but he no longer tailed her at a distance. His vehicle was "right on the bumper" of appellant's car. N.T. at 922. The constant phone calls continued, and, if appellant took the phone off the hook, Welsh would appear at the door. N.T. at 923. He also phoned her continuously at work, and he would tell her she had no house to come home to. N.T. at 933, 1669. In February of 1983, appellant was expecting a visit from her daughter and grandchild. She begged Welsh to leave

2. Appellant's friend called the police who were not going to file a report until appellant's friend insisted on it. N.T. at 1487.

her alone, but he said he would continue to hound her. N.T. at 932. Just before the visit, Welsh phoned appellant and threatened to throw acid on her face. N.T. at 936. Totally distraught, appellant went to Welsh's residence to get him to stop, and he laughed as she screamed that she could not bear his harassment any more. *Id.* Appellant ran out of Welsh's apartment without her coat and keys. N.T. at 937. Welsh would not let her back in the apartment, and after a struggle on the steps, he sat outside in his van while she knocked on the door in vain. Because she was freezing, appellant broke the door glass to get her coat and purse. N.T. at 938. Welsh called the police, who filed a report over the incident. *Id.*

Welsh got into appellant's apartment whenever he wished, always looking to see if appellant had a man with her. N.T. at 939. He continued to follow her, watch her, phone her, and pound her doors day and night. *Id.* Appellant knew he was "sick" and felt sorry for him even though every phone call to her was the same: "You deserve to die"; "You ruined my life and you're going to pay for it." N.T. at 941–42. Appellant's superior officer noticed that appellant became less talkative and seemed dazed in February and March of 1983. N.T. at 1676. Welsh was warned by appellant's superior officer to stay away from appellant while she was on duty, as Welsh had taken to cruising in his van near the police station when appellant was working. N.T. at 1665–67.

On March 16, 1983, the night before the shooting, appellant drove to a friend's house. Welsh followed in his vehicle, tailgating appellant and bumping into the rear of her car at traffic lights. N.T. at 944. Appellant and her woman friend went to a lounge and had a few drinks. Welsh appeared there, so appellant and her friend left and went to an after hours club. N.T. at 947. Appellant spoke briefly with an old friend and neighbor, Steve Owens. Welsh, who had followed appellant to the club and who also knew Owens, asked appellant: "Are you going to take him home tonight, slut." N.T. at 953. Appellant took her

woman friend home shortly thereafter at about 4 or 5 in the morning, and returned to her apartment to prepare for bed.

Steve Owens went, uninvited, to appellant's apartment and, shortly thereafter, Welsh began kicking the front door. N.T. at 961. Appellant did not go to the door, but she became quite upset, realizing that Welsh was "going to do something." N.T. at 726–27, 962. Welsh then went to the back door and started kicking and banging on it. N.T. at 964.

Knowing that Welsh would be able to break in the back door, appellant went to the door holding a gun at her side and let Welsh in. There was a struggle for the gun. Welsh took the gun from appellant, but appellant and Owens were able to retrieve the gun from Welsh. N.T. at 970–80. Owens testified that Welsh appeared to be "wild-eyed" and was not "the person that I had known." N.T. at 731. Welsh immediately left, and within seconds, Welsh threw a brick through the window of appellant's car, N.T. at 981, prompting a neighbor to remark to her son: "He really looks like he's mad today." N.T. at 146.

Appellant called the police, and Owens left to get cigarettes as they waited for the police to arrive. N.T. at 984. The back door was unlocked. As appellant stood at the kitchen sink, Welsh suddenly appeared in her kitchen pointing a .357 Magnum revolver within six inches of her face. N.T. at 984. Welsh told appellant she was going to die, and she begged him not to kill her as she tried to get her hand on the gun to get it away from her head. N.T. at 985. Appellant stated at trial that "He was crazy. He didn't even know who I was in his eyes. I never saw him like that." *Id.* Welsh backed appellant into her bedroom, and when she tripped, he beat her on the back of her head and neck with the gun. N.T. at 987. Welsh kicked appellant and continued to tell her she was "done now." *Id.* Appellant crawled toward Welsh convinced she would die but still trying to prevent him from shooting her in the face. *Id.* Appellant was able to locate her gun, and suddenly Welsh disappeared. N.T. at 989.

Appellant knew Welsh would return because he always returned, so she stepped out onto the back porch to look for him, not wanting to be caught with her guard down. N.T. at 990. As she leaned over the railing, appellant saw Welsh on the ground below aiming his gun at her. *Id.* Believing that she heard a shot, appellant fired her gun twice. *Id.* One of the bullets entered Welsh at the top of his right shoulder and exited near his clavicle, severing a major artery.[3] N.T. at 202. At the time of his death, Welsh's blood alcohol level was .14. N.T. at 212.

Appellant recalled little of what occurred following the shooting. According to police records, she called the police twice after discharging her gun, and was found on her porch in a state of hysteria when the police arrived. Welsh was found dead beside his van with the fingers of his left hand wrapped around the grip and trigger of a .357 Magnum revolver that had not been fired. Appellant received her *Miranda* warnings immediately after police officers kicked in her front door, which she had been unable to open for them. Appellant consistently stated to the police, "He shot at me. I shot at him." Appellant had difficulty, however, describing what had precipitated the shooting as police officers attempted to reconstruct the sequence of events by walking through appellant's apartment with her and discussing with her how the shooting might have occurred. Appellant did not learn that Welsh was dead until she was enroute in a police vehicle to the Public Safety Building in downtown Pittsburgh.

Appellant was charged with one count of criminal homicide. Privately retained counsel filed a motion to suppress the statements made by appellant at the scene, which motion was denied by the Court of Common Pleas of Allegheny County. On September 14, 1983, a jury convict-

---

**3.** The Commonwealth argues that Welsh was shot in the back, but the forensic pathologist who performed the autopsy on Welsh's body testified that the entry wound was located 12¼ inches from the top of Welsh's head and 6½ inches to the right of the posterior midline of his body. This description places the entry wound at the top of Welsh's right shoulder.

ed appellant of murder of the third degree. Motions for a new trial and in arrest of judgment were denied, and appellant was sentenced to seven to fourteen years imprisonment on July 25, 1984. The public defender's office was appointed to represent appellant for purposes of pursuing her appeal, and on September 23, 1986, Superior Court affirmed the judgment of sentence, 358 Pa.Super. 270, 517 A.2d 540.

The issues of merit presented herein arise within the context of claims of the ineffectiveness of trial counsel.[4] The ineffectiveness of counsel is shown where there is merit to the underlying claim, the course chosen by counsel does not have a reasonable basis, and the defendant shows prejudice. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

■ Appellant asserts that her trial counsel was ineffective in failing to request a jury instruction that would require the jury to consider the cumulative effects of psy-

---

**4.** Appellant raises six additional issues for this Court's review. They are:

WHERE ALL OF THE COMMONWEALTH'S EVIDENCE ESTABLISHED THAT THE SUSPECT WAS BABBLING, AND NOT LISTENING WHEN THE *MIRANDA* RIGHTS WERE READ, WERE THOSE RIGHTS LEGALLY ISSUED TO HER?

DOES THE COMMONWEALTH'S ADMITTED FAILURE TO OBTAIN AN EXPLICIT WAIVER OF *MIRANDA* RIGHTS VIOLATE *COMMONWEALTH V. BUSSEY?*

IS IT ERROR THAT THE PROSECUTOR KNOWINGLY AND ADMITTEDLY PUT ON FALSE TESTIMONY, SOLELY TO IMPEACH THE WITNESS?

UNDER *COMMONWEALTH V. BRICKER,* DOES THE PROSECUTOR'S MISCONDUCT NECESSITATE A NEW TRIAL?

IS RESENTENCING REQUIRED BECAUSE OF INSUFFICIENT JUSTIFICATION OF THE SENTENCE?

DOES *COMMONWEALTH V. PITTMAN* REQUIRE RESENTENCING SO THAT THE COMMONWEALTH CAN ELECT WHETHER OR NOT TO INVOKE THE MANDATORY SENTENCE?

We have reviewed the record and we are satisfied with Superior Court's disposition of the issues involving the *Miranda* warnings given to appellant, the impeachment of the Commonwealth's witness, and the sufficiency of the trial court's justification for the sentence imposed. We have concluded that the remaining issues were not raised before the trial court or Superior Court in that neither court addressed them. Those issues, therefore, have been waived. *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974).

chological and physical abuse when assessing the reasonableness of a battered person's fear of imminent danger of death or serious bodily harm with respect to a claim of self-defense. The trial court charged the jury on self-defense as follows:

> Now, special rules apply in determining the availability of the defense of justification or of self-defense when deadly force was involved. Because the Commonwealth has the burden of disproving the defense of justification, you may find the defendant guilty only if you're satisfied beyond a reasonable doubt that she did not reasonably believe that the use of deadly force was then and there necessary to protect herself against death or serious bodily injury. In other words, if you're satisfied beyond a reasonable doubt that the defendant was not reasonable in her belief that the use of deadly force was then and there necessary to protect herself from the danger of death or serious bodily injury, then you may find the defendant guilty of one of the crimes charged. However, if the defendant believed it was necessary to use deadly force to protect herself from death or serious bodily injury but her belief was unreasonable, then the degree of homicide would not rise higher than voluntary manslaughter and, under those circumstances, if you so find, you may find her guilty of voluntary manslaughter.

N.T. at 1723–24.

Appellant's trial counsel did not request jury instructions that would require the jury to consider the abuse suffered by appellant in assessing the reasonableness of appellant's fear of imminent danger of death or serious bodily injury at the time she shot Welsh. The trial court did not instruct the jury as to the legal relevance of the history of abuse presented at trial on behalf of appellant. The failure of counsel to request this instruction was clearly erroneous under the law of this Commonwealth.

■ When evidence of self-defense arises from any source, the Commonwealth must disprove self-defense beyond a reasonable doubt. *Commonwealth v. Jacobs*, 501

Pa. 139, 460 A.2d 728 (1983). To sustain that burden, the Commonwealth must prove that 1) the defendant did not reasonably believe that he or she was in danger of death or serious bodily injury; 2) the defendant provoked the use of force; or 3) the defendant had a duty to retreat and retreat was possible with complete safety. *Commonwealth v. Burns*, 490 Pa. 352, 416 A.2d 506 (1980).

The trial court herein properly determined that appellant had no duty to retreat. 18 Pa.C.S.A. § 505(b)(2)(ii)(A) (actor is not obligated to retreat from his dwelling unless he was the initial aggressor). Nor was there any serious contention that appellant provoked the attack on her by Welsh on the morning of March 17.[5] The only issue remaining, therefore, was whether appellant had a reasonable belief that she was in imminent danger.

In *Commonwealth v. Watson*, 494 Pa. 467, 472–73, 431 A.2d 949, 952 (1981) this Court stated that:

> [where] there has been physical abuse over a long period of time, the circumstances which assist the court in determining the reasonableness of a defendant's fear of death or serious injury at the time of a killing include the defendant's familiarity with the victim's behavior in the past.

Thus, the jury should have been apprised of the fact that the abuse appellant suffered for three years was to be considered by the jury with respect to the reasonableness of appellant's fear of imminent danger of death or serious bodily injury. Appellant's trial counsel had no reasonable basis for failing to request such a charge to the jury, and the absence of the charge was prejudicial to appellant in that the jury likely would have found appellant not guilty of murder of the third degree if such an instruction had been given. *See Commonwealth v. Fisher*, 342 Pa.Super. 533, 543–44, 493 A.2d 719, 724 (1985).

---

5. The prosecutor attempted to show that appellant deliberately provoked Welsh's attacks by talking with and dating other men. N.T. at 1133–36.

■ Appellant also asserts that her trial counsel was ineffective in failing to request a jury instruction that would require the jury to consider the cumulative effects of psychological and physical abuse when assessing what constitutes sufficient provocation to support a conviction for voluntary manslaughter.

■ The voluntary manslaughter charge given to the jury was as follows:

Now, what is voluntary manslaughter? A person commits voluntary manslaughter when he intentionally kills another but, at the time of the killing, he is acting under serious provocation on the part of the person he killed. The serious provocation referred to is conduct sufficient to excite an intense passion in a reasonable person. And passion includes anger, terror, rage or resentment. However, if a reasonable cooling time elapses between the provocation and the killing, the provocation will not reduce murder to voluntary manslaughter. A person can also be guilty of voluntary manslaughter if he intentionally or knowingly kills another person if, at the time he believes that it was necessary to do so to protect himself from death or serious bodily injury, but his belief was unreasonable.

N.T. at 1721–22.

This Court has held that sufficient provocation to support a conviction for manslaughter may be established by "the cumulative impact of a series of related events," and that the "ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was 'incapable of cool reflection.'" *Commonwealth v. McCusker*, 448 Pa. 382, 389, 292 A.2d 286, 290 (1972). Where there is evidence of a series of related events which tend to establish adequate provocation, the trial court must give the *McCusker* instruction. *Commonwealth v. Solomon*, 471 Pa. 417, 370 A.2d 372 (1977); *Commonwealth v. Voytko*, 349 Pa.Super. 320, 503 A.2d 20 (1986) (new trial required where trial court failed to instruct jury that serious provo-

cation could be based upon cumulative effect of series of related events). Trial counsel herein did not request the *McCusker* charge, nor did the trial court give one. Trial counsel had no reasonable basis for failing to request the charge. His ineffectiveness prejudiced appellant in that if the jury would have had the benefit of this instruction, the jury would likely have found that appellant did not have the capacity to reflect at the time she shot Welsh and thus could have found her guilty of the reduced charge of voluntary manslaughter.

Because of the ineffectiveness of trial counsel in not requesting the proper jury instructions on self-defense and voluntary manslaughter, we reverse and remand for a new trial.

■ In addition, appellant asserts that her trial counsel was ineffective in failing to present expert testimony regarding the characteristics of the victims of psychological and physical abuse, where uncontradicted testimony revealed that appellant was the victim of such abuse, and the jury, without the aid of expert testimony, rendered a verdict based upon erroneous myths concerning the victims of such abuse. This is the issue that amici framed in terms of the "battered woman syndrome."

It has long been the law of this Commonwealth that "[e]xpert testimony is admissible in all cases, civil and criminal alike, when it involves explanations and inferences not within the range of ordinary training, knowledge, intelligence and experience." *Commonwealth v. Seese*, 512 Pa. 439, 442, 517 A.2d 920, 921 (1986) (quoting *Commonwealth v. Nasuti*, 385 Pa. 436, 443, 123 A.2d 435, 438 (1956)). Because the battered woman syndrome is not within the ordinary training, knowledge, intelligence and experience of jurors, we believe that expert testimony regarding battered women is admissible as the basis for proving justification in the use of deadly force where the defendant has been shown to be a victim of psychological and physical abuse.

"A battered woman is a woman who is repeatedly subjected to any forceful physical or psychological behavior by a

man in order to coerce her to do something he wants her to do without any concern for her rights." Walker, *The Battered Woman* at xv (1979). Battered women have been compared to hostages, prisoners of war, and concentration camp victims,[6] and the battered woman syndrome is recognized as a post-traumatic stress disorder.[7] It is widely acknowledged that commonly held beliefs about battered women are subject to myths that ultimately place the blame for battering on the battered victim. For example, battered women are generally considered to be masochists who derive pleasure from being abused. Walker, *supra* at 20.[8] This myth was exploited by the prosecutor in the instant case when he asked appellant if she was "a willing participant in the activities that went on between [her] and William Welsh," N.T. at 1186, and when he stressed to the jury in his closing argument that if appellant had truly been an innocent victim she could have put an end to the relationship. Similarly, this myth was given credence by the Supe-

6. See *State v. Hundley*, 236 Kan. 461, 466, 693 P.2d 475, 479 (1985), where the court stated:
   > The abuse is so severe, for so long a time, and the threat of great bodily harm so constant, it creates a standard mental attitude in its victims. Battered women are terror-stricken people whose mental state is distorted and bears a marked resemblance to that of a hostage or a prisoner of war. The horrible beatings they are subjected to brainwash them into believing there is nothing they can do. They live in constant fear of another eruption of violence. They become disturbed persons from the torture.

   *See also* Crocker, *The Meaning of Equality for Battered Women Who Kill Men in Self-Defense*, 8 Harv. Women's L.J. 121, 128 n. 30 (1985). Researchers have suggested that the psychological effects of the battered woman syndrome can be compared to classic brainwashing. Comment, *The Battered Spouse Syndrome as a Defense to a Homicide Charge Under the Pennsylvania Crimes Code*, 26 Vill.L.Rev. 105, 111–12 (1980). These effects include fear, hyper-suggestibility, isolation, guilt, and emotional dependency, which culminate in a woman's belief that "she *should not* and *can not* escape." *Id.* (emphasis in original).

7. Johann and Osanka, *I Didn't Mean to Kill Him*, Barrister 19, 21 (Fall 1987).

8. *See also* Schneider, *Equal Rights to Trial for Women: Sex Bias in the Law of Self-Defense*, 15 Harv.C.R.–C.L.L.Rev. 623, 625 (1980); Walker, Thyfault, Browne, *Beyond the Juror's Ken: Battered Women*, 7 Vt.L. Rev. 1, 1–2 (1982).

rior Court which determined that appellant's assertion of self-defense was unreasonable because of "[t]he continued relationship between appellant and the victim." 358 Pa.Super. at 277, 517 A.2d at 544. These "blame the victim" myths enable juries to remain oblivious to the fact that battering is not acceptable behavior, and such myths do not begin to address why battered women remain in battering relationships.[9]

Other myths commonly believed about battered women are that battered women are uneducated, with few job skills, and that the police can protect the battered woman. Walker, *supra* at 23, 26. These myths were also exploited by the prosecutor who introduced testimony that detailed the police training appellant had received, implying that her training made her incapable of being victimized by a batterer, and who argued to the jury that appellant could have been rescued, if she had wanted to be rescued, by a law enforcement system ready, willing and able to protect women who are victims of domestic violence.[10] To the contrary,

9. The court in *Hundley, supra* note 6, 236 Kan. at 465–68, 693 P.2d at 478–79, noted that there is no easy answer to why battered women remain in battering relationships, and stated that:

It is not a new phenomenon, having been recognized *and justified* since Old Testament times. It goes largely unreported, but is well documented. It is extremely widespread, estimated to affect between four and forty million women.... Even though [the battering of women in intimate relationships] is now recognized as a crime in all fifty states, all the traditional attitudes have made legal and actual recognition of [battering's] criminal nature slow in coming. Even after it is recognized as a crime, it is difficult to obtain even-handed enforcement. The misconceptions have affected the battered woman's perception of herself and reduced the options available to her.... [Battered women] feel incapable of reaching out for help and justifiably fear reprisals from angry [batterers] if they leave or call the police.

(citations omitted) (emphasis added).

10. An additional myth was advanced by the prosecutor, i.e., that appellant used weapons to defend herself and having used weapons did not conform to the stereotype of battered women who suffer their beatings passively. Although there are battered women who do not defend themselves and die as a result of their injuries, the fact that a woman attempts to defend herself from a beating does not make her any less a battered woman in that her attempts do not stop the repeated episodes of physical and emotional abuse. *See* Schneider,

researchers have shown that many battered women are highly competent workers and successful career women, who include among their ranks doctors, lawyers, nurses, homemakers, politicians and psychologists. Walker, *supra* at 19. Moreover, statistics have shown that police departments do not make arrests as often in domestic assault cases as they do in non-domestic assault cases. *See Watson v. Kansas City, Kansas*, 857 F.2d 690 (10th Cir.1988); *see also* N.T. at 340 (testimony of Pittsburgh Police Lieutenant Michael Conroy who was one of the first officers to arrive at appellant's apartment on the morning of the shooting—"Any type of a domestic disturbance very, very seldom is ever a police report made.")

A properly qualified expert would have been able to assail these myths and to inform the jury that battered women are nearly always subject to intense sexual jealousy which leads them to isolate themselves socially. Walker, *supra* at 114, 172. Expert testimony would reveal that battered women view batterers "as omnipotent in terms of their ability to survey their women's activities," *id.* at 148, and that there are reasons for battered women's reluctance to seek help from others, such as fear, embarrassment, and the inability of police to respond in ways that are helpful to the battered women. *See* Crocker, *supra* note 6, at 134. Expert testimony would also have shown that among battered women who kill, the final incident that precipitates the killing is viewed by the battered woman as "more severe and more life-threatening than prior incidents." Schneider, *supra* note 8, at 634; *see also* Walker, *supra* at 220.[11]

On the basis of such expert testimony, the jury could have found that appellant herein was a battered woman and that, like most battered women, appellant was isolated and

*Women's Self–Defense Work and the Problem of Expert Testimony on Battering,* in Civil Rights Litigation Handbook 237–38 (1986).

**11.** This Court stated in *Watson, supra,* 494 Pa. at 473, 431 A.2d at 952, that "in determining the reasonableness of a defendant's belief [in imminent danger of death or serious bodily injury], we must also take into account any changes in her husband's behavior towards her immediately before the killing."

justifiably believed that no one could help her solve her predicament except herself. It was clear from the evidence presented at trial that Welsh's colleagues in the police department did little to protect appellant from Welsh's surveillance, harassment, acts of vandalism and assaults.[12] Yet, the prosecutor argued to the jury that the lack of adequate police protection in this instance had less of a bearing on appellant's sense of isolation than it did on the Commonwealth's theory that appellant must not have really been a helpless victim of battering. Notes of Testimony (Excerpts) at 323–26.

Had trial counsel introduced expert testimony about the battered woman syndrome, the actions taken by appellant on the morning of March 17, 1983, would have been weighed by the jury in light of how the reasonably prudent *battered woman* would have perceived and reacted to Welsh's behavior. Trial counsel proceeded to trial on the theory that appellant had experienced psychological and physical abuse inflicted upon her by the victim and that at the time she shot Welsh she was acting in self-defense. There was no reasonable basis for trial counsel not to call an expert witness to counter the erroneous battered woman myths upon which the Commonwealth built its case.[13] Thus, trial counsel was ineffective, and the absence of such expert testimony was prejudicial to appellant in that the jury was permitted, on the basis of unfounded myths, to assess appellant's claim that she had a reasonable belief that she faced a life-threatening situation when she fired her gun at Welsh.

**12.** It is interesting to note that studies done in England have shown that police are among those groups with the highest incidence of wife beating. Walker, *supra,* at 24.

**13.** In comparing the results in homicide cases where expert testimony about battering is permitted and introduced with those homicide cases where the jury does not hear expert testimony about battering, it has been shown that judges sentence more leniently and juries acquit or convict of lesser charges more often when they are educated by this expert testimony. Walker, Thyfault, Browne, *supra* note 8, at 14.

■ Therefore, additionally, because of the unique psychological condition of the battered woman and because of the myths commonly held about battered women, it is clear that where a pattern of battering has been shown, the battered woman syndrome must be presented to the jury through the introduction of relevant evidence.

Accordingly, we reverse the order of Superior Court which affirmed the judgment of sentence, and we remand for a new trial consistent with this opinion.

ZAPPALA, J., filed a concurring opinion in which FLAHERTY, J., joined.

NIX, C.J., filed a dissenting opinion in which McDERMOTT, J., joined.

ZAPPALA, Justice, concurring.

I agree with Justice Larsen that Appellant's trial counsel was ineffective in failing to request an instruction that would have provided guidance to the jury as to the import of the history of the physical and psychological abuse in determining whether the Appellant reasonably believed that she was in danger of death or serious bodily injury. The jury heard extensive testimony about the victim's violent nature and the abusive relationship between the Appellant and the victim. The jury was never instructed, however, that this history of abuse should be considered in determining whether the Appellant's belief that she was in imminent danger of serious bodily injury or death prior to the shooting was reasonable. The trial court's instructions on the issue of self-defense did not address this critical point of law, *see Commonwealth v. Watson*, 494 Pa. 467, 431 A.2d 949 (1981). Trial counsel's failure to request such an instruction was inimical to his client's interests. No more harmful omission is conceivable.

For this reason alone, I believe a new trial is warranted. I would not address the second issue of whether a separate defense referred to as "battered woman syndrome" is recognizable under the law of this Commonwealth. Although

the issue was addressed by amici, the Appellant has made it clear that the "battered woman syndrome" is not involved in this matter. In footnote 5 of Appellant's brief, appellate counsel made it clear that Appellant's position on the self-defense issue is not to be mischaracterized as a failure to raise the "battered woman syndrome" issue. While I recognize the import of this issue, I believe its resolution is best left to a time when the issue is squarely before us.

FLAHERTY, J., joins in this concurring opinion.

NIX, Chief Justice, dissenting.

The appellant here is a uniquely fortunate litigant in that the Supreme Court of this Commonwealth has elected to serve as her counsel. At trial, the parties contented themselves to address the self-defense issue in the traditional mode. On appeal, the issue of self-defense was argued consistent with traditional standards. The defense, as well as the prosecution, advised this Court at oral argument that the question of the applicability of the theory of what is known as "the battered women syndrome," was not an issue in this case. Indeed the only reference in the briefs to this theory was by the amici. Notwithstanding this Court has chosen this appeal as the vehicle to recognize this doctrine as a valid defense for the first time in the history of this Commonwealth. Without commenting as to the merits or advisability of recognizing such a defense, I am constrained to express my chagrin with the abandonment by my colleagues of fundamental principles of sound jurisprudence. Regardless how laudable a particular provision may be, that judgment should only be made on a record that has fully explored all the ramifications of its adoption.

Experience has repeatedly demonstrated that precipitous judicial action often provides unfortunate consequences in the long run. In my view this issue is not properly before the Court in this appeal and therefore I cannot agree with this Court's conclusion that counsel's failure to pursue it constitutes ineffective assistance.

McDERMOTT, J., joins in this opinion.