J-S23034-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| AMIR R.R. CRUZ-WEST | : | |
| | : | |
| Appellant | : | |
| | : | No. 1037 EDA 2015 |

Appeal from the PCRA Order March 13, 2015
in the Court of Common Pleas of Philadelphia County Criminal Division
at No(s):   CP-51-CR-0005601-2008
CP-51-CR-0005602-2008

BEFORE: PANELLA, OTT, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED MAY 27, 2016**

*Pro se* Appellant, Amir R.R. Cruz-West, appeals from the order entered

in the Philadelphia County Court of Common Pleas dismissing his first

petition for relief filed pursuant to the Post Conviction Relief Act[1] ("PCRA").

Appellant claims PCRA counsel was ineffective by failing to argue that trial

counsel was ineffective by failing to (1) request a **McCusker**[2] charge, and

(2) call an expert to testify that Appellant was suffering from post-traumatic

stress disorder.  Appellant also claims the PCRA court erred by (1) failing to

---

[*] Former Justice specially assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

[2] **Commonwealth v. McCusker**, 292 A.2d 286 (Pa. 1972).

consider the merits of his claims, and (2) improperly adopting PCRA counsel's **Turner**/**Finley**[3] brief. We affirm.

We adopt the facts as set forth by a prior panel of this Court.

At around 12:00 p.m. in the afternoon, on January 31, 2008, Troy Jennings and Marcellus Johnson were fatally shot outside of 36 North St. Bernard Street in Philadelphia. Just prior to the shooting, Charles Partlow who lived with his grandmother at 40 North St. Bernard Street, was in his grandmother's basement when he heard Mr. Jennings, whom he had known all his life, yelling outside. Mr. Partlow went outside and saw Mr. Jennings standing in front of 36 North St. Bernard Street and heard him screaming, "Come on out. Let's fight. Today the day. We got to fight. I told you don't come around here." Mr. Partlow walked over to 36 North St. Bernard Street, walked past Mr. Jennings and through the front door, where he saw [Appellant] standing in the vestibule. He asked [Appellant] if he was all right and [Appellant] said, "Yeah" after which Mr. Partlow walked back to his grandmother's house. At no point did Mr. Partlow observe Mr. Jennings with a weapon.

Albert Crane, IV, who lived at 36 North St. Bernard Street, was awakened by the sound of Mr. Jennings yelling outside of his home. When Mr. Crane came down the steps, he saw [Appellant] was in his vestibule and he went outside to try and calm Mr. Jennings down. After a few minutes of standing outside, Mr. Crane saw Mr. Johnson, also known as "Smurf," pull up to the house, get out, and ask for a cigarette. Mr. Crane went back inside the house to get his car keys; at this point [Appellant] was sitting inside the house about half way up the stairs which led to the living room. Mr. Crane told [Appellant] to calm down and that he would go back outside and tell Mr. Jennings the same. Once outside again, Mr. Crane, Mr. Jennings, and Mr. Johnson "laughed" and "joked," while Mr. Crane

---

[3] **Commonwealth v. Turner**, 544 A.2d 927 (Pa. 1988); **Commonwealth v. Finley**, 550 A.2d 213 (Pa. Super. 1988) (*en banc*).

stood near the railing of his front porch. After about five minutes, [Appellant] came out through the front door of the house, holding a shotgun, shot Mr. Jennings and Mr. Johnson from 5 to 10 feet away, and ran towards Arch Street. Mr. Partlow, at the time of the shooting, was standing in the doorway of his grandmother's house with his attention diverted away from 36 North St. Bernard Street when he heard gunshots. When he turned to look over at 36 North St. Bernard Street, he observed [Appellant] running away with a shotgun in his hand.

Mr. Crane recognized the gun [Appellant] used as the shotgun Michael Robinson, a recent resident at 36 North St. Bernard Street, owned and kept in the house. Mr. Robinson testified that he owned a Mossberg Model 500, 12-gauge shotgun which was kept in the house and that he had previously shown [Appellant] the shotgun yet had never given him permission to use it. Neither victim was seen with a weapon at any point on the day of the shooting. Police Officer Jerold Harris, after receiving a radio call of a shooting, and arriving on the scene, put Mr. Johnson into a police vehicle to rush him to the hospital and checked Mr. Johnson's person for weapons and did not find any. Mr. Jennings had been shot twice in the neck, causing his carotid artery and jugular vein to be completely severed, while Mr. Johnson had two shotgun wounds to his back. Both victims were pronounced dead on January 31, 2008.

The ballistics expert testified that he had received, from the Medical Examiner's Office, six uncoated lead pellets an Assistant Medical Examiner had taken from the body of Mr. Jennings, and four uncoated lead pellets from Mr. Johnson's body, which were all consistent with being Double-0 buckshot. Four fired 12 gauge shot shells, marked Double-0 buck, were retrieved from the crime scene, as well as two lead spherical pellets that were all consistent with Double-0 buckshot. The ballistics expert was unable to opine whether or not the fired shots were all fired from the same firearm.

[Appellant] testified at trial and claimed he acted in self-defense. He testified that, a few months before the shooting, Mr. Jennings had threatened him with a shotgun,

- 3 -

one that was different from the one [Appellant] had used, and that Mr. Jennings had eventually calmed down but told [Appellant] to never come back around the neighborhood. He also testified that, in 2005, Mr. Jennings shot at [Appellant's] sister's vehicle yet neither incident was ever reported to the police. [Appellant] said he came to visit Mr. Crane at his house on the day of the shooting, and saw Mr. Jennings staring at him aggressively near 33 [sic] North St. Bernard Street. [Appellant] walked over to Mr. Crane's home, used the key he had to get inside, and then locked the door. Mr. Crane asked him to stay on the steps inside the house and then walked outside to ask Mr. Jennings what was going on. Mr. Johnson arrived at the home shortly after. When Mr. Crane came back inside the house, [Appellant] testified that Mr. Crane told him, "I think they strapped." After Mr. Crane went back outside, [Appellant] went upstairs, retrieved Mr. Robinson's shotgun, went back downstairs, out the front door, and shot Mr. Jennings and Mr. Johnson, although he testified that he did not see Mr. Johnson. [Appellant] admitted he did not see Mr. Jennings with a weapon on the day of the shooting.

***Commonwealth v. Cruz-West***, 3442 EDA 2010 (unpublished memorandum at 1-3) (Pa. Super. Nov. 18, 2011) (citing Trial Ct. Op., 6/9/11, at 1-4) (citations omitted).

Following a jury trial, Appellant was convicted of two counts of first-degree murder[4] and one count of possessing an instrument of crime ("PIC").[5] Appellant was sentenced to two concurrent life sentences for the first-degree murder charges and a concurrent three months to five years' imprisonment for PIC. Appellant did not file post-trial motions or a direct

---

[4] 18 Pa.C.S. § 2502(a).

[5] 18 Pa.C.S. § 907(a).

appeal. On August 5, 2010, counsel filed a PCRA petition seeking reinstatement of his appeal rights which was granted. On December 17, 2010, Appellant filed a notice of appeal *nunc pro tunc*. This Court affirmed his judgment of sentence on November 18, 2011. **See id.** On April 27, 2012, the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal. **Commonwealth v. Cruz-West**, 42 A.3d 1058 (Pa. 2012).

On April 16, 2013, *pro se* Appellant filed a PCRA petition. Counsel was appointed and on January 23, 2015, sought permission to withdraw pursuant to **Turner**/**Finley**. On February 10, 2015, the PCRA court filed a Pa.R.Crim.P. 907 notice of intent to dismiss, notifying Appellant he had twenty days within which to file a response. Appellant filed a *pro se* response to the Rule 907 notice.[6] On March 13, 2015, the court granted counsel permission to withdraw and dismissed the PCRA petition. This timely appeal followed. Appellant filed a court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal, and the PCRA court filed a responsive opinion.

Appellant raises the following issues for our review:

---

[6] Appellant's response was filed on March 9, 2015. However, his certificate of service indicates that it was mailed by first class mail on February 24, 2015. Under the "prisoner mailbox rule," a *pro se* prisoner's document is deemed filed on the date he delivers it to prison authorities for mailing. **See Commonwealth v. Wilson**, 911 A.2d 942, 944 n.2 (Pa. Super. 2006).

> I. Was PCRA counsel ineffective[7] in failing to argue that trial counsel was ineffective for failing to request a **McCusker** charge or its equivalent to explain to the jury how the violent history between Appellant and victim (Troy Jennings) could amount to provocation; and B) failing to call on psychiatric expert testimony to explain that provocation relative to Appellant's mindset at the time was translatable as a form of post-traumatic stress?
>
> II. Did PCRA counsel and the court err in dismissing claim I as previously litigated and thus fail to consider the merits of the actual argument?
>
> III. Was the PCRA court's wholesale adoption of every point made by PCRA counsel in violation of **Commonwealth v. Williams**, [ ] 732 A.2d 1167 [Pa. 1999]?

Appellant's Brief at vii (footnote omitted).

---

[7] In **Commonwealth v. Ford**, 44 A.3d 1190 (Pa. Super. 2012), this Court held that "claims of PCRA counsel ineffectiveness cannot be raised for the first time after a notice of appeal has been taken from the underlying PCRA matter." **Id.** at 1201. However, the **Ford** Court opined that "a majority of the Supreme Court agrees that issues of PCRA counsel effectiveness must be raised in a serial PCRA petition or **in response to a notice of dismissal before the PCRA court**." **Id.** at 1200 (emphasis added). We note that

> a claim of PCRA counsel ineffectiveness set forth for the first time in a Rule 907 response to a notice of intent to dismiss during a petitioner's first PCRA proceeding is not a second or serial petition, nor is it an amended petition. Rather, the claim is more properly viewed as an objection to dismissal.

**Commonwealth v. Rykard**, 55 A.3d 1177, 1187 (Pa. Super. 2012). In the case *sub judice*, Appellant asserted that "PCRA counsel was ineffective in misconstruing the objectives of arguments I, II, and III" in his response to the PCRA court's notice of intent to dismiss pursuant to Pa.R.Crim.P. 907. Objection to the Court's Notice of Intent to Dismiss, 3/10/15, at 1. Therefore, we address Appellant's issues raised on appeal. **See id.**; **Ford**, 44 A.3d at 1200.

First, Appellant contends that

> [w]hen undisputed evidence of a series of related events serves as a critical element in establishing provocation, the trial [c]ourt must give the **McCusker** instruction or its equivalent. The voluntary manslaughter instruction employs a tentative mention of "a series of related events"; however, the idea was perfected in **Stonehouse**,[8] where the [defendant's] history with her attacker amounted to Battered Woman's Syndrome, a sub-facet beneath the umbrella of Post-Traumatic-Stress-Disorder. Here [Appellant] previously fought the victim, and the victim pulled a shotgun on [Appellant], explicitly expressing that he would kill [Appellant] if he (Jennings) encountered [Appellant] again. Expert testimony would have fleshed-out in lay terms the categorical degrees of PTSD, and the litany of irrationalities one afflicted with even a mild case of the disorder undergoes. Thus Appellant's "belief" he was in mortal danger would have resonated as credible when the fact finders were delegated to read his mind—because of the way being provoked prior to the events affected his belief.

*Id.* at 5.

Our review is governed by the following principles.

> Under our standard of review for an appeal from the denial of PCRA relief, we must determine whether the ruling of the PCRA court is supported by the record and is free of legal error. The PCRA court's credibility determinations are binding on this Court when they are supported by the record. However, this Court applies a *de novo* standard of review to the PCRA court's legal conclusions.

> To be eligible for PCRA relief, a petitioner must plead and prove by a preponderance of the evidence that his or her conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). These circumstances include a violation of the

---

[8] **Commonwealth v. Stonehouse**, 555 A.2d 772 (Pa. 1989).

- 7 -

Pennsylvania or United States Constitution and ineffective assistance of counsel which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(i), (ii).

\* \* \*

To prevail on a claim of ineffective assistance of counsel, a petitioner must overcome the presumption that counsel is effective by establishing all of the following three elements, as set forth in *Commonwealth v. Pierce*, [ ] 527 A.2d 973, 975–76 ([Pa.] 1987): (1) the underlying legal claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice because of counsel's ineffectiveness.

*Commonwealth v. Chmiel*, 30 A.3d 1111, 1127-28 (Pa. 2011) (some

citations omitted).

Additionally, counsel cannot be deemed ineffective for failing to raise a meritless claim. Finally, because a PCRA petitioner must establish all the *Pierce* prongs to be entitled to relief, we are not required to analyze the elements of an ineffectiveness claim in any specific order; thus, if a claim fails under any required element, we may dismiss the claim on that basis.

*Commonwealth v. Treibe*r, 121 A.3d 435, 445 (Pa. 2015) (citations

omitted).

In determining a layered claim of ineffectiveness, the critical inquiry is whether the first attorney that the defendant asserts was ineffective did, in fact, render ineffective assistance of counsel. If that attorney was effective, then subsequent counsel cannot be deemed ineffective for failing to raise the underlying issue.

*Rykard*, 55 A.3d at 1190 (quotation marks and citation omitted).

In *McCusker*, the Pennsylvania Supreme Court opined as follows.

- 8 -

We must decide today whether psychiatric evidence is admissible in a murder prosecution for the limited purpose of determining whether a defendant acted in the heat of passion. We are persuaded by the almost unanimous voice of professionally recognized authorities that such evidence is competent and in certain circumstances admissible.

\* \* \*

[The a]ppellant sought to establish the general and well-recognized requirements for a jury finding of voluntary manslaughter. Specifically he attempted to establish that as a result of adequate provocation he acted in the heat of passion when he killed his wife. Our law is quite explicit that the determination of whether a certain quantum of provocation is sufficient to support the defense of voluntary manslaughter is purely an objective standard.

\* \* \*

In making the objective determination as to what constitutes sufficient provocation reliance may be placed upon the cumulative impact of a series of related events. The ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was 'incapable of cool reflection.'

*Id.* at 287, 289-90 (footnotes omitted);

The defendant in *McCusker*, to establish provocation,

relied on three events immediately preceding the slaying: his awareness within the last month before the crime that his wife had entered into a meretricious relationship with his step-brother; his knowledge within minutes of the crime that his wife was perhaps pregnant with his step-brother's child; and his wife's threat immediately before the crime that she was going to leave defendant and take with her his only child.

- 9 -

*Id.* at 289-90; *see also Commonwealth v. Mason*, 130 A.3d 601, 629 n.34 (Pa. 2015).

In **Stonehouse**,

[The a]ppellant asserts that her trial counsel was ineffective in failing to request a jury instruction that would require the jury to consider the cumulative effects of psychological and physical abuse when assessing the reasonableness of a battered person's fear of imminent danger of death or serious bodily harm with respect to a claim of self-defense.

**Stonehouse**, 555 A.2d at 781.

The evidence presented at trial in **Stonehouse** established the decedent's physical and psychological abuse towards the defendant lasted three years. *Id.* at 774-781. The Pennsylvania Supreme Court described the abuse: "The events culminating in [the decedent's] death are so bizarre that one would be tempted to dismiss them as the stuff of pulp fiction were it not for the corroboration of disinterested witnesses and for the fact that literature on the 'battered women syndrome' is replete with similar cases." *Id.* at 774. Immediately prior to the killing, the decedent pointed a gun at the defendant's face, telling her that she was going to die. *Id.* at 779. He kicked her continuously and beat her with the gun on her head and neck, while she pleaded with him not to kill her. *Id.* The decedent left, and knowing that he would return, the defendant went outside to the back porch. *Id.* at 780. The decedent returned and aimed the gun at her, she heard shots, and then she fired a gun at him twice, resulting in his death. *Id.* The

- 10 -

Supreme Court held that trial counsel was ineffective because where there is "evidence of a series of related events which tend to establish adequate provocation, the trial court must give the **McCusker** instruction." **Id.** at 782 (citation omitted).

In **Commonwealth v. Potts**, 406 A.2d 1007 (Pa. 1979), the Pennsylvania Supreme Court opined:

> [The a]ppellant contends that trial counsel was ineffective in failing to present available psychiatric and psychological testimony which would have been highly relevant in determining whether appellant acted with malice, thus committing murder or acted in the heat of passion, committing voluntary manslaughter. **Commonwealth v. McCusker**, [ ] 292 A.2d 296 ([Pa.] 1972). Since the sole issue at trial was the appellant's state of mind at the time of the shooting, we conclude that trial counsel's failure to present the **available psychiatric and psychological testimony** had no reasonable basis designed to effectuate his client's interest.
>
> Between appellant's arrest and his trial, he was examined by a psychiatrist and a psychologist. Trial counsel had two relevant reports concerning appellant's state of mind.

**Potts**, 406 A.2d at 1008 (some citations omitted and emphasis added).

> Where a claim is made of counsel's ineffectiveness for failing to call witnesses, it is the appellant's burden to show that the witness existed and was available; counsel was aware of, or had a duty to know of the witness; the witness was willing and able to appear; and the proposed testimony was necessary in order to avoid prejudice to the appellant.

**Chmiel**, 30 A.3d at 1143 (quotation marks and citation omitted).

In the case at bar, the PCRA court opined that Appellant

correctly asserts that [**McCusker**] provides the test for determining legal provocation; however, the facts of [Appellant's] case fall short of the test, hence, this claim is without merit.

\* \* \*

[Appellant] claims that two events led to the killings: a prior physical altercation with Jennings, and a shooting involving [Appellant's] sister. In the prior incident between [Appellant] and Jennings, [Appellant] and Jennings got into a closed-fist physical altercation within the vestibule of Crane's home. Following the fight, Jennings walked across the street to his home, retrieved a shotgun and crossed the street towards [Appellant], stating that he was going to shoot [Appellant]. Crane stepped in front of Jennings and calmed him before Jennings was able to act on his statements. The second incident, for which [Appellant] was not present, involved a verbal altercation between Jennings and [Appellant's] sister outside her home, and resulted in Jennings firing a shotgun at the car of [Appellant's] friend.

Despite [Appellant's] citing to this history as provocation, in the moments immediately preceding the shooting, [Appellant], when asked about his state of mind by a witness, simply responded, "I'm cool." Another witness also testified at trial that the occurrence of berating by Jennings was nothing out of the ordinary. These responses do not reflect that his mind was at all 'incapable of cool reflection.' Witness testimony also shows that, prior to the shooting, there was a period of approximately five minutes where Jennings had ceased his yelling at [Appellant]. Based on the facts presented, [Appellant] did not act in the heat of passion when he committed the homicide; the prior cited incidents are insufficient to be deemed adequate provocation, and the five minutes of "quiet" was sufficient 'cooling time' to enable [Appellant] time to reflect and reason. [Appellant] again demonstrated that his mind was "cool" when he

inquired about Yim Chhat's[9] disposition before entering the living room to retrieve the gun,[10] moments prior to him walking down the stairs of Crane's home, exiting through the front door and shooting Jennings and Johnson.

In **McCusker**, the events which preceded the Court's holding that psychiatric evidence was admissible showed that [the defendant] had a history of mental disorders. [the defendant's] mental state, coupled with his recently learning that he wife had an affair with his step-brother and was possibly with child, and had threatened to take custody of their only child, were what led the court to allow expert testimony. [Appellant] had no history of mental illness, and the culmination of events that lead to [Appellant] shooting Jennings and Johnson does not meet this standard. . . .

[Appellant] additionally claims that counsel was ineffective for failing to present psychiatric expert testimony to describe "one's mind state while in fear and in a state of panic." [Appellant] cites to **Commonwealth v. Stonehouse**[, 555 A.2d 772 (Pa. 1989)] as support for this claim, stating that the need for expert testimony in **Stonehouse** sets the standard for a need for expert testimony in the case at bar. However, the standard set in **Stonehouse** and the facts therein differ vastly from [Appellant's] case. . . .

The issues in **Stonehouse** surrounded the entrance of a battered woman syndrome defense on the basis of the cumulative effects of psychological and physical abuse in determining the "reasonableness of a battered person's fear of imminent danger of death or serious bodily harm. . . ." **Stonehouse**, 555 A.2d at 774. The facts in **Stonehouse** detailed abuse rendered by the [defendant's] boyfriend that was ongoing for a period of three years.

---

[9] Yim Chhat was Crane's girlfriend. N.T., 1/13/10, at 134. Prior to the shooting, she was upstairs in Crane's house and Appellant had asked her if she was dressed. **Id.** at 139.

[10] Chhat testified the shotgun "was next to the doorway of the kitchen and the living room, laying up against the wall." **Id.** at 140.

The abuse consisted of property damage, including stealing her vehicle on numerous occasions, breaking into her home and destroying its interior, stalking, threats of harm to [her] life, safety and friends, and several instances of both verbal and physical attacks on the [defendant].

\*　　\*　　\*

In the case at bar, the circumstances surrounding [Appellant's] killing of two individuals did not warrant a need for such expert testimony. [Appellant] cited to only one prior instance between him and the victim which preceded the killings; another incident did not involve him and he was not privy to it until days later. As testimony reflects, on the day of the incident, there was a period of calm prior to [Appellant] stepping outside and shooting the victims. . . .

PCRA Ct. Op., 7/31/15, at 15-19 (footnotes omitted). We agree no relief is due.

At the time of trial, Appellant testified to the following. On the date of the incident he was going to visit Albert Crane. N.T., 1/19/10, at 10. He knew Crane and Troy Jennings all of his life. *Id.*

[Defense counsel]: What happened that morning?

[Appellant]: Well, I was walking up the street.

Q: What street?

A: Up St. Bernard Street to visit Albert at his house at 36, and I see Troy coming out his house. And he—he was grittin' on me and I gritted back.

Q: What do you mean by grittin' . . . ?

A: . . . he was looking at me, staring at me aggressively. And he asked me what the f*** was I looking at and didn't he tell me not to come around the block anymore; that if I came back around, he was going to shoot me. . . .

- 14 -

* * *

Q: . . . Is this just yelling back and forth, or what happened?

A: . . . I tried to avoid the situation. I told him, like, I didn't want any problems, you know. And he just kept speed—he just started speed-walkin' across the street as in trying to—as in like he was going to do something to me.

Q: What did you do?

A: I tried—I went into the house. I had a key to Albert's house, and I went into the front door. And I just closed the door and locked the door. . . . And I turned around and Albert is . . . coming out his apartment door inside the vestibule . . . .

* * *

He came down the stairs, and he asked me what was going on.

I told Albert Troy was starting his shit again like last time when he pulled the gun out on me months prior to that day.

Q: When did that happen?

A: It was about two months—two months ago, two or three months before the incident that day.

Q: And what happened that day?

A: That day me and Troy had a fight inside of Albert's vestibule.

* * *

Q: [H]ow did it end?

A: . . . Albert, he broke the fight up.

- 15 -

Q: Okay.

A: And Troy went outside across the street to his house at 29 North St. Bernard Street. He comes back out his house and across—back across the street towards Albert [sic] house with a shotgun in his—in his—in his hands.

\* \* \*

He—he's walking towards me, but Albert jumped in front of him. Albert asked him what the fuck was he doing. . . . Troy . . . said that I was—I'm going to air this pussy out.

So Albert says, [t]here's kids out here, and you need to cool out. So he—he calmed down and he told me the next time that I come around here, I come around the block, that I will be shot. And he walks back across the street.

Q: When you say he had a problem with your sister, did your sister have an incident with him?

A: Yes.

Q: When was that?

A: It was—it was over the years since about 2005. . . .

\* \* \*

My sister, she lives at—she was living at 23 North St. Bernard Street. Every time she had friends come over, Troy would just harass her.

\* \* \*

Q: What happened?

A: What happened **in 2005**, my sister's—my sister's friend Mychele, she—her boyfriend stops in front of my sister's house and they shoot—and Troy shoots her—his car up. He shot—he shot the guy's car up.

Q: Now, just so we're clear, **were you present when that took place**?

- 16 -

A: **No**.

* * *

Q: . . . Now, the day of this shooting in January of 2008, I believe you said you went in the house?

A: Yes.

Q: . . . What happened after that, after you locked the door?

A: After I locked the door, I turned around and see Albert coming out his apartment door. He asked me, "What's going on?"

I told him that Troy's starting his shit again like the last time when he pulled his shotgun out on me **months prior to the incident**.

* * *

Albert went downstairs—

Q: . . . Albert.

A:—towards the door, and I went upstairs into the apartment. And I asked Yim was she dressed, Albert's girlfriend, and I grabbed the gun.

Q: Where was it?

A: It was in the living room. So I grabbed the gun from the living room where Yim was sleeping at. And I sit on the—at the top of the steps, at the top of the stairway.

So now I just hear Albert say it ain't—tells Troy it ain't worth it.

Troy said, "I don't give a f***. If he [sic] not going to come out, I'm going to come in there."

So now I'm definitely scared now.

- 17 -

* * *

> So I go downstairs with the gun and I come outside. I see Troy coming up—coming up the porch steps and Albert is trying to stop him, and I just came out the—the door. I just started shootin'. I-
>
> Q: Where did you shoot from?
>
> A: I walked out the door and I took two steps on the porch and I —and I just shot. I just started shootin'.
>
> Q: Who were you shootin' at?
>
> A: I was shooting at Troy, and I didn't see anything else. I just—I just—I just saw Troy. And after I stopped shooting, I see that "Smurf"[11] was hit. . . .

N.T., 1/19/10, at 11-17, 20-23 (emphases added).

On cross-examination, Appellant testified as follows.

> [The Commonwealth]: . . . Did you see a gun in Troy's hands that day that he died?
>
> A: No.
>
> Q: Did you see a knife or a bat or a stick or a weapon of any kind in Troy Jenning's hand before you shot?
>
> A: No.
>
> * * *
>
> Q: . . . [D]id you see a gun at all . . . .
>
> A: No.
>
> Q: —in the hands of Marcellus Johnson?

---

[11] Marcellus Johnson.

A: No.

Q: A bat?

A: No.

Q: A gun?

A: No.

Q: A stick?

A: No.

*Id.* at 27-28.

At trial, the Commonwealth asked Crane to tell the jury what happened on the date of the incident:

A: . . . I was woken up by an argument between [Appellant] and Troy. I—when I came down the steps, [Appellant] was already in my hallway. You had two doors to get to my house, so he was already in the hallway. I came down, opened the door. I—I asked him to cool down; I'll go outside and cool Troy out.

I went outside. I was there for a second. Marcellus, "Smurf," was pulling up. He—asked me for a cigarette, so I ran back in to get the keys to the car.

\* \* \*

Q: . . . And when you say you told [Appellant] or you asked [Appellant] to cool down and then you would go outside and tell Troy to cool down—

A: Correct.

Q: —from your perspective, was [Appellant] also in need of cooling down?

A: . . . [N]ot really.

- 19 -

* * *

So [Appellant] sat down on my steps about 12 steps up into the living room, so he sat there. I came up, got the keys, came back out, got "Smurf" the cigarette. We laughed. We joked.

You know, Troy was a little verbal at times, you know, and we laughed. We joked. And then moments later, maybe five minutes passed, [Appellant] comes out with the shotgun and shot "Smurf" and Troy.

* * *

[Defense counsel]: Now, you wake up because you hear this argument?

A: Correct.

Q: What do you do?

A: . . . I went down stairs. I told [Appellant] to calm down. I'm going to go outside and calm Troy down. I calmed him down. I got . . . "Smurf" the cigarette. Everything was fine. And that's when the shots went off.

* * *

Q: [Appellant] said, "Troy's acting the fool again," or something, words to that effect—

A: Correct.

Q: . . . At that point in time you said [Appellant's] calm; right?

A: Yeah.

* * *

Q: . . . So everything was dead calm when the shooting took place; is that what you're saying?

A: Yeah. . . . "Smurf" was smoking a cigarette. Troy was standing there. We were all talking; correct.

N.T., 1/13/10, at 93-94, 111-13, 121.

Charles Partlow testified to the following. On the day of the incident he was doing laundry at his grandmother's house located at 40 North St. Bernard Street. *Id.* at 43. He heard arguing between Appellant and Troy. *Id.* at 44. He came out to see what was going on. *Id.* Troy was saying "Come on out. Let's fight." *Id.* Appellant was standing in the vestibule in 36 North St. Bernard behind the door. *Id.* at 44-45. He asked Appellant if he was alright. *Id.* at 45. He said "You cool" and Appellant said "Yeah." *Id.* Crane and Troy were talking and then Troy was yelling at Appellant through the door. *Id.* at 46. He was not looking at the doorway at the time he heard the two shots. *Id.*

First, Appellant contends PCRA counsel was ineffective for failing to argue that trial counsel was ineffective for failing to request a *McCusker* charge, relying upon *Stonehouse*. Appellant's Brief at 3.

In the case at bar, there was no evidence of a series of related events to establish adequate provocation for the two shootings. Appellant testified that Troy had a problem with his sister in 2005. He was not present when the incident took place. He testified that months before the shooting, Troy had "pulled his shotgun out" on him. Crane testified that Appellant was calm before the shootings took place. Before the killings, Appellant had a cooling off period. Based on the facts presented at trial, Appellant did not establish

- 21 -

that the killings resulted from a series of recent and related events that led to sudden and intense passion. *See Stonehouse*, 555 A.2d at 782; *McCusker*, 292 A.2d at 290. Having found no merit in this claim, trial counsel was not ineffective for failing to request a *McCusker* charge. *See Treiber*, 121 A.3d at 445; *Chimel*, 30 A.3d at 1127-28. Therefore, PCRA counsel was not ineffective for failing to raise trial counsel's ineffectiveness. *See Rykard*, 55 A.3d at 1190.

Appellant's claim that PCRA counsel was ineffective for failing to argue that trial counsel was ineffective for failing to present psychiatric expert testimony to explain that Appellant's provocation was "translatable as a form of post-traumatic stress" is meritless. Appellant did not show that a psychiatric expert witness existed and was available, that counsel was aware of the witness, and the witness was able to appear and was necessary to avoid prejudice. *See Chmiel*, 30 A.3d at 1143; *Potts*, 406 A.2d at 1008. Thus, trial counsel was not ineffective for failing to present an expert psychiatric witness. *See Chimel*, 30 A.3d at 1127-28. Therefore, PCRA counsel cannot be deemed ineffective and Appellant's claim is without merit. *See Rykard*, 55 A.3d at 1190.

We address Appellants last two claims as they are interrelated. Appellant contends the PCRA court failed to consider the merits of his

arguments because its analysis was identical to that of PCRA counsel.[12] Appellant's Brief at 7. He asserts that "[t]he PCRA court's wholesale adoption of every point made by PCRA counsel is in violation of *Commonwealth v. Willliams*. . . ."

In *Williams*,

[t]he PCRA court . . . issued a three-page opinion restating the procedural history of the case and, **without further explanation**, stating as follows:

We are unusually impressed and satisfied that the arguments advanced by the Commonwealth, in its brief in support of its Motion to Dismiss, accurately set forth the facts and the law that govern this case.

Therefore, in the interest of judicial economy and rather than needlessly expend precious judicial time that can be better spent on other pending matters, this Court hereby adopts the Brief submitted by the District Attorney and makes same a part hereof.

*Williams*, 732 A.2d at 1173 (emphasis added). The *Williams* Court opined: "We cannot, however, in this post-conviction case involving a review of the propriety of a death sentence, condone the wholesale adoption by the post-conviction court of an advocate's brief." *Id.* at 1176.

---

[12] We note that "[w]e may affirm the trial court on any ground." *Commonwealth v. Lynch*, 820 A.2d 728, 730 n.3 (Pa. Super. 2003)

In the case *sub judice*, the PCRA court did not adopt PCRA counsel's **Turner**/**Finley** no merits letter as its own opinion. **See** Notice Pursuant to Pennsylvania Rule of Criminal Procedure 907, 2/10/15, at 1-17. Appellant's reliance on **Williams** is unavailing.

According, we affirm the PCRA court's order dismissing Appellant's PCRA petition.

Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/27/2016