J-S50031-20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA,    :    IN THE SUPERIOR COURT OF
      :         PENNSYLVANIA
           Appellee    :
      :
         v.        :
      :
KENNETH HOYLE,       :
      :
          Appellant    :    No. 1362 EDA 2020

Appeal from the Judgment of Sentence Entered October 19, 2018
in the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008019-2017

COMMONWEALTH OF PENNSYLVANIA,    :    IN THE SUPERIOR COURT OF
      :         PENNSYLVANIA
           Appellee    :
      :
         v.        :
      :
KENNETH HOYLE,       :
      :
          Appellant    :    No. 1363 EDA 2020

Appeal from the Judgment of Sentence Entered October 19, 2018
in the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008020-2017

BEFORE:    BENDER, P.J.E., SHOGAN, J. and STRASSBURGER, J.*

MEMORANDUM BY BENDER, P.J.E.:         **FILED APRIL 20, 2021**

Kenneth Hoyle (Appellant) appeals *nunc pro tunc* from the October 19, 2018 judgments of sentence of two consecutive terms of life incarceration, without the possibility of parole, imposed after a jury convicted him of two counts of first-degree murder and one count of possessing an instrument of crime (PIC). Upon review, we affirm.

---

*Retired Senior Judge assigned to the Superior Court.

Appellant's charges stem from an incident "in the early morning hours of July 16, 2017, [when] Appellant shot his [next-door] neighbor, Robert DePaul, and DePaul's female companion, August Dempsey, after a verbal altercation." *Commonwealth v. Hoyle*, No. 443 EDA 2019, unpublished memorandum at 1 (Pa. Super. filed March 27, 2020). The trial court thoroughly recounted the evidence presented at trial, as follows.

> Police officer Brian Brent testified that he was at 4670 James Street for a separate incident when he heard a man's voice yelling followed by a few gunshots from somewhere in the area. Officer Brent headed in the direction of the gunshots[3] and met up with Officer Murray, who was also in the area. The officers encountered Appellant's wife, who "calmly" directed the officers down a breezeway, where they discovered two victims, one male and one female, with gunshot wounds to the head. A picture of the position of decedents' bodies, marked Commonwealth Exhibit C-47[,] was shown to the jury.[4] Notably, DePaul's feet were not on Appellant's property[;] instead they were on the property of a third neighbor[, located at 4713 James Street].
>
> > [3] Appellant live[d] at 4711 James Street. DePaul lived at 4709 James Street. [Appellant shared a breezeway with another individual who lived at 4713 James Street. The shooting occurred in the breezeway between 4711 and 4713 James Street.]
> >
> > [4] C-47 shows DePaul laying [*sic*] facedown diagonally across the breezeway. Dempsey is also laying [*sic*] facedown and diagonally across the breezeway, her body is draped over that of DePaul's.
>
> Officer Brent testified that Appellant approached him at the crime scene and "calmly" said[,] "I'm the homeowner…[.] Y'all took too long to come here [and] I shot them." Officer Brent did not see any weapons present on the victims.
>
> A video was played for the jury that depict[ed] the decedents walking across the front of their property onto and across Appellant's property[,] and then down the breezeway between

- 2 -

Appellant's house and the 4713 house. The video does not show the actual [shootings]. The last camera to capture the decedents shows DePaul walk down the breezeway approximately forty seconds before Dempsey.

Police 911 tapes were also played for the jury. The first call comes in July 16, 2017, at 1:29 [a.m., during which] Appellant's wife was requesting an officer to 4711 James Street because her neighbor from 4709 was drunk and destroying her fence. The next call comes in [nine minutes] later at 1:38 [a.m., during which] Appellant's wife reported that her neighbor was exposing his private parts to her and destroying her property. When asked to provide a description of the neighbor she stated that "he is white" and "my neighbor." Appellant's wife further requested that police come to her property because her neighbor has a no trespassing sign, and then said[,] "the cops gotta come here, next thing he's gonna pull a gun on us." When told that police [would] be sent, she requested that police "knock or ring the doorbell" when they arrive[d].

The next call, at 1:47 [a.m.], was from Appellant demanding to know why the police ha[d] not arrived yet. Appellant stated[,] "my neighbor is ready to go over the fence and attack us." He also told the dispatcher "they better get out here." The next call, at 1:52 [a.m.], was from Officer Brent reporting a shooting at his location.

At 1:53 [a.m.],[8] Appellant called police dispatch and [told] them to "go out on the front porch." When asked by the dispatch if he need[ed] the police or ambulance Appellant responded, "yea, I shot both of them." When asked who he shot, Appellant responded[,] "the people that were attacking us, I told you to get here, you didn't come." When asked if he shot two people, Appellant responded[,] "the second round looks like it hit the other person, I don't know." When asked if he shot males or females, Appellant responded "a male and I think a female, I'm not sure." Appellant's voice was very calm throughout the entire conversation.[9]

_____

[8] There are three additional calls between the 1:52 [a.m. call by] Officer Brent … and the 1:53 [a.m. call by] Appellant[;] they do not contain any relevant information.

- 3 -

[9] All recordings after 1:56 [a.m.] are communications between emergency [personnel].

Detective Donald Marano recovered an audiotape, and it was played for the jury.[10] The audiotape was taken from Appellant's property – Appellant had been recording his interactions with DePaul. The majority of the tape is DePaul and Appellant arguing, threatening each other, and trading expletives. DePaul is clearly intoxicated and Appellant ha[d] a sarcastic tone and is taunting DePaul.

[10] The first speaker on the audiotape is DePaul, the first female heard is Dempsey, the other male's voice is Appellant[,] and the other female's voice is Appellant's wife.

During the quarrel, Appellant told DePaul to invest in fire insurance because his house is going to burn down one day. Shortly thereafter, DePaul told Appellant that he can choke the [shit] out of him, to which Appellant responded, "any time Bob, I'm standing right here now." Appellant told DePaul that he "better thank his little [ass], she held me back tonight." [It appeared Appellant was referring to Appellant's wife holding him back.] Appellant then told his wife[,] "I wanna take care of this [mother fucker]."

The situation escalate[d] twenty three minutes and forty seconds into the recording when DePaul told Appellant "why don't you open your gate and let me come up the alleyway." Appellant responded, "come on up, come on up."

Appellant can be heard whispering something, the only audible words are "stopping him" and "the property." Appellant's wife asks Appellant if he is going to open the gate and he responded, "no, I'm not going to open the gate, I want him caught in the alleyway." Appellant then directed his wife to "go get the spotlight."

DePaul can be heard saying[,] "alright, here I am Ken, hello Ken." Appellant's wife then asked DePaul what he [was] doing on their property. DePaul and Appellant's wife yelled at each other and DePaul said[,] "he asked me to come over." [DePaul also said that he was not on Appellant's property, but was on the neighbor's property and neutral property. DePaul continued to

ask Appellant's wife where Appellant was, and she told him not to worry about it. Simultaneously, Dempsey pleaded with DePaul to leave.] Less than two minutes later, [] there is a loud noise, which was the sound of trashcans being knocked over. Ten seconds later, a gun was fired a total of four time in eight seconds. [Between the first shot and the next three shots, Dempsey yelled, "Oh my fucking God! What the…."] After the gunshots, Appellant can be heard saying something in the background, but the words are inaudible. Police responders can be heard two and a half minutes after the last gunshot was fired. The recording ends a minute and a half later.

Detective Marano testified that the breezeway in which the decedents' bodies were found had a spotlight in it. Detective Marano also secured a camera from inside Appellant's residence. The camera contained pictures taken by Appellant's wife of the decedents on the night of the murders. Notably, there are seven pictures of DePaul standing in the breezeway before he was shot. In each of the photographs[,] DePaul is standing on the 4713 house's side of the breezeway. In Commonwealth Exhibit 61AF, Dempsey and DePaul are standing in the right frame of the photograph, and three metal trashcans are upright in the left frame of the photograph. In Commonwealth Exhibit 61AH, DePaul's right side of his body is visible in the foreground, Dempsey can be seen walking away, and[,] in the background[,] three metal trashcans are lying down across the breezeway.

Police [O]fficer Jacqueline Davis testified that she and her partner[,] Officer Gregory Yatcilla[,] processed the crime scene. Appellant's backyard was separated from the breezeway, where the victims' bodies were found, by a gate, which was five feet, two inches high, and locked. Officers recovered a bullet fragment in the breezeway next to the victims' bodies. Additionally, there was blood on the fence post at the end of the breezeway that divided Appellant's backyard from the [backyard of the house at] 4713…. There was no blood on the top of Appellant's gate or on the ground in front of his gateway.

Inside Appellant's house, officers discovered a revolver with four spent casings and two live rounds still in the cylinder. In the kitchen, tacked to the wall, was the criminal [history] of [] DePaul from the First Judicial District [of Philadelphia]. Additionally, the decedent and Appellant had adjoining properties, with a fence dividing their respective backyards.

Officer Davis testified that pieces of the fence were missing and the broken parts were laying [*sic*] in Appellant's backyard.

Dr. Albert Chu, Deputy Medical Examiner, testified that Dempsey had been shot twice, once in the right side of her forehead and once in the left buttock. DePaul also suffered two gunshot wounds, one to the center of his forehead and one to the left side of his lower back. The exit wound for the gunshot to DePaul's back showed markings that resembled the pattern of the tank top DePaul was wearing when he died. Dr. Chu explained that when the portion of a body that a bullet exits is supported, for example on the ground, there are sometimes markings around the exit wound that correspond to whatever was pressed against the skin when the victim was shot. Therefore, the markings surrounding the exit wound on DePaul's [chest] are consistent with DePaul['s] being on the ground at the time he was shot in the back. DePaul had injuries to his right elbow and right hand that were consistent with blunt-force trauma.[13] Additionally, a toxicology test was performed on DePaul, and his blood alcohol content was .262 at the time of his death.

> [13] Dr. Chu agreed with Appellant's counsel that these injuries could have been caused by punching through a wooden fence.

Police Officer John Cannon, from the Firearms Identification Unit, testified that the bullet jacket recovered from the crime scene was an expanding type jacket. Furthermore, all of the ballistic evidence recovered from the crime scene and the decedents' bodies matched the firearm recovered from Appellant's home.

Appellant presented evidence. Nancy Jamison testified that Appellant is her older brother, and that Appellant has a reputation as being peaceful and law-abiding.

Police officer Brian Murray testified that, on July 17, 2017[,] around 1:00 [a.m.], approximately one hour prior to the murders, he was responding to another call in the neighborhood and came in contact with DePaul. DePaul was intoxicated, yelling loudly, generally, and then at him in a confrontational manner. Officer Murray instructed DePaul to go into his house[.] DePaul never approached Officer Murray.

Furthermore, Officer Murray had contact with Appellant immediately after the murders. Appellant was "very calm" and "very stoic," Officer Murray called him "shockingly calm for the type of situation." Appellant was cooperative with Officer Murray, and told Officer Murray[,]

> that he had shot both individuals that were laying [*sic*] on his property. He stated that DePaul had been threatening him[,] and that he gave multiple warnings to leave, … which [DePaul had] refused. He stated he was fearing for his safety and his wife's due to their age and health, so that he had shot them. And Appellant said … that he knew the female was there but [he] didn't realize that he had shot her until he came around to approach [the police].

N.T., 10/18/2018[,] at 26-33.

Trial Court Opinion (TCO), 8/18/2020, at 2-9 (names altered; some footnotes and record citations omitted).

> Appellant was arrested on July 17, 2017, and charged in two separate cases (pertaining to each victim) with the above-stated crimes. His cases were consolidated and, at the close of his jury trial on October 19, 2018, he was convicted of each offense with which he was charged. Appellant was sentenced that same day to the term of incarceration set forth *supra*. He filed a timely post-sentence motion, which was denied on February 6, 2019.

***Hoyle***, No. 443 EDA 2019, unpublished memorandum at 1-2. Appellant filed a single notice of appeal from his judgment of sentence, listing both docket numbers. Accordingly, this Court quashed Appellant's notice of appeal as it violated ***Commonwealth v. Walker***, 185 A.3d 969 (Pa. 2018), and the mandates of Pa.R.A.P. 341(a). ***Hoyle***, No. 443 EDA 2019, unpublished memorandum at 2-4.

On March 27, 2020, Appellant timely filed a petition pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546, seeking to

reinstate his direct appeal rights. The PCRA court granted the petition, and this *nunc pro tunc* notice of appeal followed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.[1] On appeal, Appellant raises three issues for our review.

> I.  Was the evidence sufficient to support Appellant's convictions for first-degre[e] murder and [PIC] where the Commonwealth failed to prove beyond a reasonable doubt that Appellant did not justifiably act in self-defense?
>
> II. Were Appellant's convictions against the clear weight of the evidence where an audio recording of the events preceding the shooting, multiple 911 calls, and evidence from the crime scene all corroborated Appellant's claim that he was justified in shooting [] DePaul?
>
> III. Did the trial court err when it ruled that Appellant was not entitled to present expert testimony to establish his state of mind at the time of the shooting in support of his justification defense?

Appellant's Brief at 5 (capitalization altered).

We begin with Appellant's challenge to the sufficiency of the evidence, which we consider mindful of the following:

> When reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to

---

[1] We are troubled by Appellant's incorporating by reference his post-sentence motions in his Pa.R.A.P. 1925(b) statement. However, the trial court was able to ascertain and address the issues raised by Appellant and, thus, Appellant's improper incorporation has not hampered our review.

determine the weight to accord to each witness's testimony and to believe all, part or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Steele*, 234 A.3d 840, 845 (Pa. Super. 2020) (citations and quotation marks omitted).

Instantly, Appellant "does not deny that he intentionally shot [] DePaul, but maintains that his convictions for first-degree murder and [PIC] cannot stand because the Commonwealth's evidence failed to establish that he was not acting in self-defense at the time of the shooting." Appellant's Brief at 19.

If a defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving the self-defense claim beyond a reasonable doubt. The use of force against a person is justified "when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force" by the other person. 18 Pa.C.S.[] § 505(a). A self-defense claim thus entails three elements: (1) the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (2) the defendant was free from fault in provoking the difficulty which culminated in his use of deadly force; and (3) the defendant did not violate any duty to retreat.

*Steele*, 234 A.3d at 846 (some citations and quotation marks omitted).

The Commonwealth sustains that burden of negation if it proves any of the following: that the slayer was not free from fault in provoking or continuing the difficulty which resulted in the slaying; that the slayer did not reasonably believe that [he] was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save [him]self therefrom; or

that the slayer violated a duty to retreat or avoid the danger.

***Commonwealth v. Mouzon***, 53 A.3d 738, 740-41 (Pa. 2012) (citations and quotation marks omitted).

On appeal, Appellant relies on the 911 calls to establish that he reasonably was in fear of death or serious bodily injury, attempted to de-escalate the confrontation, and did not violate a duty to retreat, as he "was on the porch of his home in the middle of the night while [] DePaul was in the process of scaling his fence to advance upon him." Appellant's Brief at 21-22.

As detailed by the trial court, the jury had the benefit of hearing the 911 calls and the audiotape of the confrontation.

> The audiotape revealed that Appellant consented to DePaul['s] coming onto his property, and then Appellant told his wife[,] "I want him caught in the alleyway[,]" and "go get the spotlight." The jury was able to compare the audio of Appellant and his wife taunting a drunken DePaul, with the 911 tapes, from the same time frame, wherein Appellant and his wife were reporting to police that they were in fear for their lives. The two recordings were in direct contradiction. The evidence presented by the Commonwealth showed that Appellant lured the decedents onto his property in order to stage the murders as self-defense; and that Appellant did not reasonably believe that deadly force was necessary to protect himself against death or serious bodily injury.
>
> Furthermore, the decedents were unarmed, in direct contradiction to Appellant's wife's claim that DePaul was going to "pull a gun on [them]." Additionally, the decedents were shot in the breezeway, prior to reaching Appellant's locked gate. In fact, all seven photos taken of DePaul by Appellant's wife show DePaul standing on the 4713 house's side of the breezeway. This evidence is corroborated by the crime scene photos[,] which show DePaul laying [*sic*] diagonally across the breezeway, with

- 10 -

his feet on the 4713 house side of the breezeway. All of the photographic evidence refutes Appellant's claim that DePaul was climbing the gate. Lastly, Appellant shot both the decedents twice – the shot to DePaul's back hit[ting] him after he was already lying on the ground.

TCO at 10-11 (names altered).

Viewed in the light most favorable to the Commonwealth, the evidence was sufficient to disprove Appellant's claim of self-defense. Namely, Appellant was not free from fault in continuing the confrontation, as he taunted DePaul and invited DePaul to his gate without the intention of going outside to meet DePaul or opening the gate, but in order to trap DePaul in the breezeway. Based upon Appellant's statements and demeanor during and after the shooting, his luring of DePaul to his gate, DePaul's not displaying a weapon, and DePaul's not attempting to enter Appellant's property, the jury was free to conclude that Appellant was not reasonably in fear of imminent danger. Moreover, Appellant could have remained inside his home instead of walking outside to shoot DePaul and Dempsey. Accordingly, Appellant is not entitled to relief on this claim.[2]

_____

[2] Appellant argues in the last paragraph of this argument section that even if the Commonwealth sustained its burden of disproving self-defense, his conviction of first-degree murder for shooting Dempsey should be overturned because the Commonwealth failed to prove beyond a reasonable doubt that Appellant intentionally shot her. Appellant's Brief at 23-24. Appellant failed to raise this claim in his court-ordered concise statement, and thus the trial court was unable to address it. Accordingly, it is waived. *See Commonwealth v. Bonnett*, 239 A.3d 1096, 1106 (Pa. Super. 2020) (citations omitted) ("It is well-established that any issue not raised in a Rule 1925(b) statement will be deemed waived for appellate review. Further, an

*(Footnote Continued Next Page)*

Appellant next argues that the verdict was against the weight of the evidence. Specifically, he contends that "the fact that he repeatedly called the police for help in removing [] DePaul from his premises on the night of the shooting so undermines confidence in the jury's rejection of his justification defense that a new trial is required in the interests of justice." Appellant's Brief at 25. Our standard of review of this claim is as follows:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

> *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citations and emphasis omitted).

> "[T]he finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Commonwealth v. Roberts*, 133 A.3d 759, 767 (Pa. Super. 2016) (citation omitted). Additionally, the Commonwealth "may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Commonwealth v. Colon-Plaza*, 136 A.3d 521, 526 (Pa. Super. 2016) (citation omitted).

_(Footnote Continued)_ ──────────────

appellant's concise statement must identify the errors with sufficient specificity for the trial court to identify and address the issues the appellant wishes to raise on appeal.").

*Commonwealth v. Bright*, 234 A.3d 744, 749 (Pa. Super. 2020) (citation format altered).

The trial court rejected Appellant's weight claim, concluding that "the jury's verdict did not shock one's sense of justice." TCO at 12 (quotation marks omitted). Upon review, we conclude the trial court did not abuse its discretion. The jury heard the 911 calls, the audio recordings of the confrontation, and viewed the physical evidence. In weighing that evidence, it was free to reject Appellant's claim of self-defense and find, instead, that Appellant committed the crimes as charged. Accordingly, Appellant is not entitled to relief on this claim.

Finally, we address whether the trial court erred when it precluded Appellant from presenting expert testimony to establish his state of mind at the time of the shooting in support of his justification defense. Appellant's Brief at 29. We consider this claim mindful of the following:

> [A]dmissibility of expert testimony is within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. It has long been established that expert opinion testimony is proper only as an aid to the jury when the subject matter is distinctly related to a science, skill, or occupation beyond the knowledge or experience of the average layman. However, expert testimony may not be used to bolster the credibility of witnesses because witness credibility is solely within the province of the jury.

*Commonwealth v. Pitts*, 740 A.2d 726, 733 (Pa. Super. 1999) (citations and quotation marks omitted).

> Psychiatric testimony has long been held admissible to prove a defendant's subjective belief that he or she is in danger of imminent death or serious bodily injury. **Commonwealth v. McCloud**, 455 A.2d 177, 179 (Pa. Super. 1983). **See also Commonwealth v. Stonehouse**, 555 A.2d 772 (Pa. 1989) (plurality) (holding that trial counsel was ineffective for failing to present expert testimony on the battered woman syndrome as a defense to homicide charges); **Commonwealth v. Light**, 326 A.2d 288 (Pa. 1974) (finding that psychiatric testimony was admissible to show whether defendant acted out of an honest, bona fide belief that he was in imminent danger at time he killed victim for purposes of establishing defense of self-defense); **Commonwealth v. Sheppard**, 648 A.2d 563 (Pa. Super. 1994) (providing that testimony of paranoid personality disorder was admissible to show if defendant had a bona fide belief he was in danger in a homicide case, although denial of introduction of such testimony by trial court was not fatal, as paranoid personality disorder did not permit claim of imperfect self-defense to be used to reduce offense from murder to voluntary manslaughter); **Commonwealth v. Miller**, 634 A.2d 614 (Pa. Super. 1993) (*en banc*) (holding that evidence of battered woman syndrome was admissible in homicide trial as probative evidence of defendant's state of mind as it relates to a theory of self-defense).

**Id.** at 734 (citation format altered).

By way of background, on September 13, 2018, Appellant gave notice of his intent to present expert evidence of a mental health condition. Specifically, Appellant proffered that, immediately prior to and at the time he shot DePaul and Dempsey, he "was acting under the mental condition of fear[,] which motivated his action." Notice, 9/13/2018, at 1. On September 18, 2018, Appellant filed a motion in *limine* to admit expert opinion testimony from Dr. Steven Samuel, a licensed psychologist, who examined Appellant regarding Appellant's subjective state of mind as to whether he had an "honest, bona fide belief that he was in imminent danger."

- 14 -

Memorandum of Law in Support of Motion in *Limine*, 9/18/2018, at 3.

According to Dr. Samuel, Appellant's evaluation did "not support the

conclusion that he is diagnosed with a psychological disorder." Dr. Samuel's

Report, 9/16/2018, at 11. Instead, Dr. Samuel concluded that Appellant shot

DePaul and Dempsey while "under the influence of extreme emotional

disturbance." *Id.* at 12. As defined by Dr. Samuel,

> [e]xtreme emotional disturbance is a state of mind in response
> to and in the presence of grave provocation. It is, objectively, an
> unreasonable fear whereas subjectively, *i.e.*, in the mind of an
> individual experiencing extreme emotional disturbance, the fear
> is reasonable. This was Appellant's state of mind at the time of
> the shootings. He was agitated, irritable and overwhelmed[,] and
> so afraid that he and his wife would be killed by DePaul that his
> judgment and self-control w[ere] suddenly and temporarily
> overcome.

*Id.* (names altered).

> On September 21, 2018, Appellant's motion in *limine* for expert
> testimony regarding Appellant's state of mind was denied. Th[e
> trial] court ruled that the expert's report contained no diagnosis;
> there were inculpatory statements from Appellant within the
> report; and Appellant's state of mind at the time of the murders
> was an issue for the jury to decide.

TCO at 13 (names and capitalization altered; citation omitted). The trial

court further explained its reasoning for denying the motion as follows.

> Dr. Samuel reviewed all the audio evidence that was eventually
> presented in this case and interviewed Appellant himself. The
> interview with Appellant focused on Appellant's personal history
> with DePaul, and contained inadmissible hearsay statements by
> Appellant regarding DePaul's bad character.
>
> Th[e trial] court had previously ruled that the evidence of
> DePaul's bad character for violence would only be admissible if
> there was evidence presented that Appellant personally knew

about it. Additionally, Dr. Samuel's report placed a much greater emphasis on the transcripts from the police calls made by Appellant than the audio recording of the actual incident.

Dr. Samuel ultimately concluded that Appellant was suffering from extreme emotional disturbance at the time of the murders. However, Dr. Samuel failed to cite extreme emotional disturbance as a recognized disorder in the Diagnostic and Statistical Manual of Mental Disorders[]. For that reason, [the trial] court found that Dr. Samuel's report contained no diagnosis. Because Dr. Samuel's expert opinion did not contain a diagnosis, and Dr. Samuel's expert report was otherwise inadmissible, th[e trial] court did not permit Dr. Samuel to testify regarding Appellant's state of mind during the murder.

*Id.* at 13-14 (names and capitalization altered; footnote omitted).

Appellant relies on *Light* to argue that the testimony was admissible to show the subjective element of his state of mind at the time of the shooting in support of his theory of self-defense. Appellant's Brief at 32. Appellant is correct that psychiatric testimony is generally admissible to prove a defendant's subjective state of mind in support of a justification defense. However, Dr. Samuel's report did not include an opinion about how Appellant's state of mind was affected by any mental disorder that Appellant may have been suffering from in order to explain why Appellant subjectively believed he was in imminent danger at the time of the shootings. *Cf., e.g.*, *Pitts*, 740 A.2d 726 (considering report that Pitts suffered from post-traumatic stress syndrome); *Sheppard*, 648 A.2d 563 (considering report that Sheppard suffered from paranoid personality disorder); *Miller*, 634 A.2d 614 (considering report that Miller suffered from battered woman syndrome). Rather, Dr. Samuel evaluated the evidence that would be

- 16 -

presented at trial, as well as some evidence provided by Appellant that the trial court had ruled inadmissible, and concluded that Appellant was subjectively afraid, though his fear was unreasonable. As such, it would not aid the jury regarding a subject matter beyond the knowledge or experience of the average layperson, and it was not admissible as expert testimony. *See Pitts*, 740 A.2d at 733. Without an underlying condition for Dr. Samuel to explain to the jury as to why Appellant's fear was subjectively reasonable, it was solely within the jury's province to weigh the evidence and determine whether Appellant subjectively believed he was in imminent danger. Moreover, the proffered testimony was inadmissible expert testimony, as it bolstered the credibility of Appellant's statements to police that he was in fear for his and his wife's lives immediately prior to and during the shooting. *Id.* Accordingly, we conclude that the trial court did not abuse its discretion in excluding Dr. Samuel's testimony.

Judgment of sentence affirmed.

Judge Strassburger did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>4/20/2021</u>